KNIGHT v STATE OF MICHIGAN

Docket No. 78-3075. Submitted March 12, 1980, at Lansing.—Decided August 11, 1980.

Plaintiffs, William H. Knight and Berneice V. Knight, individually and doing business as Island Road Farms, brought an action for damages against defendants, State of Michigan and Director of the Michigan Department of Mental Health, charging that defendants were negligent or made negligent or intentional misrepresentations in the placement of a mental patient on plaintiffs' dairy farm without disclosing his alleged fire-setting propensities. Recovery was sought in the Court of Claims for damages from a fire which destroyed the entire contents of plaintiffs' barn on the evening of January 12, 1970. Trial on the liability issue only resulted in judgment of no cause of action, Robert E. A. Boyle, J. Plaintiffs appeal. *Held:*

1. The exclusion from evidence, in a civil case, of a statement against penal interest made by a mental patient without having first been given *Miranda* warnings is within the discretion of the trial judge. The issue is whether, under the totality of the circumstances, the statement was knowing and voluntary.

2. Although mental illness or infirmity can constitute unavailability for purposes of the hearsay rule, there must be a showing that the mental illness or infirmity would prevent the declarant from being able to testify truthfully before a hearsay statement against the penal interest of the declarant will be admissible as an exception under the rules of evidence.

3. The trial court did not err in holding that an isolated

REFERENCES FOR POINTS IN HEADNOTES

[1] 4 Am Jur 2d, Appeal and Error § 76.

   5 Am Jur 2d, Appeal and Error §§ 833-835, 839-846.

[2] 29 Am Jur 2d, Evidence § 410. .

[3] 29 Am Jur 2d, Evidence §§ 618, 620.

[4] 5 Am Jur 2d, Appeal and Error § 819.

[5] 57 Am Jur 2d, Negligence § 32.

[6, 7] 39 Am Jur 2d, Guardian and Ward § 188.

   Liability of one releasing institutionalized mental patient for harm he causes. 38 ALR3d 699.

[8] 37 Am Jur 2d, Fraud and Deceit § 12.

unsubstantiated episode of fire-setting during childhood was an insufficient foundation for a finding that the mental patient was a pyromaniac.

4. It was error for the trial court to find damages had not been proven, since the parties had agreed to try the issue of damages separately; however, such error was harmless.

5. A defendant cannot be held liable for the tortious acts of a third party unless the tortious act committed was foreseeable and defendant failed to exercise reasonable care under the circumstances. Plaintiffs failed to meet their burden of proving that the act committed was foreseeable or that defendant failed to exercise reasonable care under the circumstances.

Affirmed.

1. APPEAL — FINDINGS OF FACT — COURT RULES.

Findings of fact of the trial court will not be set aside unless clearly erroneous; a finding is clearly erroneous where, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed (GCR 1963, 517.1).

2. EVIDENCE — SELF-INCRIMINATION — CIVIL PROCEEDINGS.

Statements obtained in violation of rights guaranteed by *Miranda* are not automatically excluded in a civil proceeding involving the declarer, but rather the issue is whether, under the totality of the circumstances, the statement was knowing and voluntary.

3. EVIDENCE — HEARSAY — DECLARATION AGAINST PENAL INTEREST — ADMISSIBILITY — MENTAL INCAPACITATION — UNAVAILABILITY.

A hearsay statement against the penal interest of the declarant may be admissible upon a showing of unavailability of the declarant; although "mental illness or infirmity" is included within the definition of unavailability, there must be a showing that the "mental illness or infirmity" would prevent the declarant from testifying truthfully before such mental illness or infirmity will constitute unavailability.

4. TRIAL — DAMAGES — ERROR — HARMLESS ERROR.

A finding, in a trial on the issue of liability alone, that damages have not been proven constitutes error where the parties have agreed to try the damages issue separately; however, such error is harmless where there is a finding of no liability on the part of the defendants.

5. NEGLIGENCE — ELEMENTS OF CAUSE OF ACTION.

The elements of an action for negligence are (1) duty, (2) general standard of care, (3) specific standard of care, (4) cause in fact, (5) legal or proximate cause, and (6) damages.

6. TORTS — THIRD PARTIES — RESPONSIBILITY FOR OTHERS — STANDARD OF CARE.

One who takes charge of a person having known propensities for danger is under a duty to exercise reasonable care to control the third person and prevent him from harming others; the concept of "duty of reasonable care" is interrelated with the foreseeability that the third person would engage in the particular type of conduct which caused the harm.

7. TORTS — LIABILITY FOR TORTIOUS ACTS OF AN INSANE PERSON — STANDARD OF CARE — FORESEEABILITY.

The custodian of an insane person ordinarily is not liable for the tortious acts of such person which he could not reasonably anticipate, but he may be liable where he fails to exercise reasonable care under the circumstances.

8. FRAUD — MISREPRESENTATION — ELEMENTS.

The general rule is that to constitute actionable fraud it must appear: (1) that defendant made a material representation; (2) that the material representation was false; (3) that when defendant made the material representation he knew that it was false, or made it recklessly, without any knowledge of its truth as a positive assertion; (4) that defendant made the material representation with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon the material representation; and (6) that plaintiff thereby suffered injury.

*McGinty, Rosewarne, Halverson, Brown & Jakubiak, P.C.* (by *Thomas M. Hitch, James G. Halverson* and *Nelson S. Leavitt*), for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Charles D. Hackney,* and *Michael Levine,* Assistants Attorney General, for defendants.

Before: MACKENZIE, P.J., and BASHARA and D. C. RILEY, JJ.

MacKENZIE, P.J. This appeal involves the issue of whether the state was negligent or made negligent or intentional misrepresentations in the placement of a mental patient on plaintiffs' dairy farm without disclosing his alleged fire-setting propensities. Recovery was sought for damages from a fire which destroyed the entire contents of plaintiffs' barn on the evening of January 12, 1970. By stipulation of the parties, a nonjury trial was held on the liability issue only before Judge Robert E. A. Boyle in Centreville, Michigan, on April 25 through April 28, 1978. From a judgment of no cause for action entered on July 14, 1978, plaintiffs bring this appeal as of right.

The evidence adduced at trial shows that in March, 1969, George Scheib, 19, a mentally retarded individual with an I.Q. ranging in the mid-fifties to mid-sixties, was placed on work-convalescent status on plaintiffs' farm by the Coldwater Home and Training School. He was committed to Coldwater at the age of ten and was continuously institutionalized until he went to live and work on the plaintiffs' dairy farm.

George's commitment papers contain a brief unsubstantiated reference to a precommitment incident in which George and his brother, who suffers from similar mental incapacities, allegedly set fire to a davenport in a home. The commitment documents give no indication as to which youth was responsible, and the extent of George's alleged involvement is not detailed. This probate court record on which plaintiffs relied heavily as evidence that George had set fires in the past does not in fact establish that George had set fires but merely states his involvement in that incident. During the time George was institutionalized, a detailed record of his progress and development was maintained by the Department of Mental

Health. George's retardation was diagnosed by Coldwater's psychologists as cultural-familial; *i.e.,* it was related to his family background and environment rather than genetically oriented.

In 1968, George was a resident of a male exit cottage at Coldwater and was under the supervision of Gordon Bruce Moeller, a social worker at the institution. Moeller testified at trial that the purpose of an exit cottage is to prepare an institutionalized individual for placement in a job outside of the institution. A screening process is used to determine which persons are ready for this environment, and six people consider a recommendation for entry into a cottage. Residents of exit cottages are given greater independence and are introduced to a work setting. Although residents are permitted to smoke, matches are not normally available to them. All unusual incidents of a resident's behavior are recorded. George's record in the ten years he was institutionalized and a resident of the exit cottage revealed no incidents of violent behavior or of setting fires.

The recommendation to place George on work-convalescent status was made by Moeller, who testified as to the institution's procedures and practices as they related to evaluation of residents for community placement. Moeller also testified as to what procedures he, himself, followed and what inquiry he made when evaluating George Scheib's case prior to recommending his placement with the plaintiffs.

David Knaggs, the social worker assigned to George, did not tell plaintiffs of the precommitment incident relating to possible fire-setting. However, defendants' psychology expert, Dr. Henry Leland, testified that no professional ethic requires disclosure of a patient's record at the time

of placement. Dr. Leland also testified that the procedures followed by Moeller in placing George were very good and were consistent with the manner in which social workers are expected to proceed in discharging a patient. Dr. Leland stated that a test performed on George on January 12, 1970, indicated he has a paranoid personality and is very easily influenced but that this would not necessarily lead to setting fires. He further testified that, after reviewing the same materials used by Moeller, he would have recommended the same placement because there was no information that would indicate George was not suitable for placement.

Plaintiffs testified that when they asked about George's character, Knaggs told them George had been institutionalized because of his parents' marital breakup and that he was slightly retarded.

George appeared to adjust well in the Knight home. He got along amicably with Tom Showers, another mentally retarded individual on work-convalescent status at plaintiffs' farm, and performed the tasks the Knights assigned him. George was not permitted to drive the tractor; his farm chores included removing milk equipment from the cows, breaking bales of hay, feeding the calves, and mowing the yard. Knaggs visited the farm to monitor George's progress with the Knights.

Several fires erupted on the Knight farm from August, 1969, to January 12, 1970. The Knights were able to extinguish the August fire themselves. On Friday, January 9, 1970, fire broke out in the hay loft of the barn, which was situated across the road and one-eighth of a mile from the Knight residence. Bill Knight then surmised that this fire was caused by spontaneous combustion. Knaggs arrived that afternoon to introduce Tom

Sherby, his replacement. At that time, Mrs. Knight relayed her fears that George or Tom might have set the fires. Knaggs did not have their files on hand but promised to check them back at his office and to have a talk with George and Tom about being fire watchers. After talking to George and Tom, Knaggs and Sherby left at approximately 4:30 p.m. Shortly after 6 p.m., fire again broke out in the barn. George telephoned from the barn to report the fire to the Knights. Because the doors of the barn were frozen shut, not all of the livestock could be removed from the blazing building. The barn and its contents, including some 22 dairy cows, farm equipment, and personal property, were a total loss.

Bill Knight testified that the day after the January 12th fire, Knaggs visited the Knights and told them of the alleged fire-setting incident mentioned in George's commitment record. According to Bill Knight, Knaggs said he had not previously thought it necessary to disclose the incident to the Knights because it occurred in George's early childhood.

Tom Showers testified that, immediately after noticing the fire, he observed George in the adjacent milk house placing some matches in a trash container. George told Tom he knew about the fire and was trying to put it out. Later, after interrogation by the local police, George admitted setting the fires because Bill had "bitched" at him. He felt that when there was a fire, the pressure was off him for a while.

Plaintiffs' first assignment of error is that the trial court made several unwarranted findings of fact. Findings of fact of the trial court will not be set aside unless clearly erroneous. GCR 1963, 517.1, *Warren Police Officers Ass'n v City of War-*

*ren,* 89 Mich App 400, 404; 280 NW2d 545 (1979). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Footnote omitted.) *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976).

The first factual finding disputed by plaintiffs is the trial court's determination that "there is no positive evidence beyond inference that the fires on January 9 and January 12, 1970 were set by Scheib". Plaintiffs argue that the testimony of Walter Wiedbrauk, an arson investigator for the Michigan State Police, that George admitted setting the January 12th fire with matches because William Knight had "bitched" at him constituted competent evidence that George set the fire.

Detective Wiedbrauk could not remember reading George his *Miranda*[1] rights. Officer May of the Clinton County Sheriff's Department, who was also present, testified that George was not informed of his rights. Statements obtained in violation of rights guaranteed by *Miranda* are not automatically excluded in a civil proceeding involving the declarer. *Azzaro v Stupar,* 17 Mich App 170, 174; 169 NW2d 151 (1969). In that case, this Court upheld admission of a statement obtained in the absence of *Miranda* warnings, reasoning that "plaintiff was aware of the fact he was being interviewed and we can divine no possibility as to how plaintiff could have incriminated himself as there was never a criminal action pending as a result of the accident". We perceive the issue to be whether, under the totality of the circumstances, the statement was knowing and voluntary.

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

The record in the instant case reveals that George was interviewed by Detective Wiedbrauk and Officer May on January 13, 1970. Wiedbrauk was not in uniform when George, who was then an arson suspect, was seated in the back of an unmarked police car and questioned. When added to the fact that George was mentally retarded, had a highly suggestible personality, and could have been easily intimidated by the police, we believe the exclusion of this evidence as incompetent was within the discretion of the trial judge.

Further, we believe the evidence was correctly excluded as hearsay testimony. See MRE 801(c). The testimony was potentially admissible under the declaration against penal interest exception, MRE 804(b)(3); however, the rule mandates a showing of unavailability. *People v Dortch,* 84 Mich App 184; 269 NW2d 541 (1978). Although plaintiffs are correct in stating that "mental illness or infirmity" is included within the definition of "unavailability", MRE 804(a)(4), they failed to show that George was so incapacitated that he could not testify truthfully. Plaintiffs did not even call George as a witness because they concluded that his mental state was such that he was afraid to testify or that he could not. However, we believe this determination to be better reserved for the sound discretion of the trial judge.

Plaintiffs next argue the trial court's finding that George did not have fire-setting tendencies was clearly erroneous. Plaintiffs did not offer expert testimony on the definition of that term. "Pyromania" is defined as "[i]ncendiarism; a form of affective insanity in which the mania takes the form of an irresistible impulse to burn or set fire to things". Black's Law Dictionary (4th ed), p 935. An isolated, unsubstantiated episode of fire-setting

when George was nine years old, considered with the eruption of several fires on the Knight farm in which George's involvement was questionable, did not provide a sufficient foundation for a finding that George was a pyromaniac. Further, evidence of fires which George may have set after January 12, 1970, has no relevance herein. Thus, the trial judge's finding was not clearly erroneous.

Nor do we believe the remainder of the findings of fact to which plaintiffs objected to be so prejudicial as to warrant reversal. Judge Boyle's finding that the Knights were aware of the mental defects of the laborers on their farm and should have taken precautions does not evince a clear misunderstanding of plaintiffs' case. Plaintiffs knew that the laborers were mentally retarded and should have taken reasonable safety precautions. The thrust of plaintiffs' case was that they were not informed of George's fire-setting propensities. However, as we agree with the trial judge that there was insufficient evidence to establish that George had fire-setting propensities, we find no error. Although the trial judge may have gone too far in finding that plaintiffs employed George and Tom to obtain cheap labor, any error was harmless.

The trial judge was justified in finding that Knaggs and Sherby were advocates for the Knights. Despite the fact that the two social workers were called as adverse witnesses by plaintiffs at trial, Sherby testified on a separate record that he was in fact an advocate for plaintiffs and had attempted to convince the Legislature to pass legislation so that plaintiffs could recover their damages.

The trial judge erred in finding that damages had not been proven since the parties had agreed to try the damages issue separately. However,

unless we find the trial judge erred in finding no liability on the part of defendants, the finding of no damages was harmless.

Thus, we now turn to plaintiffs' next assignment of error: that the trial court erred in determining that plaintiffs failed to satisfy their burden of proving defendants were negligent in placing George on work-convalescent status on plaintiffs' farm. "The elements of an action for negligence are (i) duty, (ii) general standard of care, (iii) specific standard of care, (iv) cause in fact, (v) legal or proximate cause, and (vi) damage[s]." *Moning v Alfono,* 400 Mich 425, 437; 254 NW2d 759 (1977).

One who takes charge of a person having known propensities for danger is under a duty to exercise reasonable care to control the third person and prevent him from harming others. Restatement of Torts 2d, § 319. Within the confines of this case, defendants had a duty of reasonable care to inform plaintiffs of any limitations or destructive tendencies in George's behavior that were known to them at the time of his placement or that became known to them while George lived with plaintiffs.

However, the concept of duty is interrelated with the foreseeability that the third person would engage in that particular type of conduct which caused the harm. *McNeal v Henry,* 82 Mich App 88; 266 NW2d 469 (1978), *Holloway v Martin Oil Service, Inc,* 79 Mich App 475; 262 NW2d 858 (1977), *lv den* 402 Mich 932 (1978). Thus, "[t]he custodian of an insane person ordinarily is not liable for the tortious acts of such person which he could not reasonably anticipate, but he may be liable where he fails to exercise reasonable care under the circumstances". (Footnotes omitted.) 44 CJS, Insane Persons, § 125, p 282. *Cf. In re Jones Estate,* 52 Mich App 628, 635; 218 NW2d 89 (1974), *lv den* 392 Mich 770 (1974).

Although the issue herein seems to be one of first impression in Michigan, the facts bear a striking resemblance to those in *Seavy v State,* 21 App Div 2d 445; 250 NYS2d 877 (1964), *aff'd* 17 NY2d 675; 269 NYS2d 455; 216 NE2d 613 (1966). In *Seavy,* a mentally deficient young man placed on work-convalescent status on a dairy farm burned down a barn 11 days after his release from custody. In affirming a judgment that the state could not be held negligent for an incident which was unforeseeable and unrelated to any previous behavior pattern, the New York Court stressed that, although the young man had a past history of being quick tempered and disagreeable and had once suffered burns after spilling cleaning fluid on his body, his record after his transfer to the second school was good and did not indicate pyromaniacal tendencies. The court held the school was under no duty to disclose the patient's record at the first school except to the extent that a specific harm might have been avoided.

Assuming *arguendo* that George did burn down plaintiffs' barn in the case at bar, we agree with the trial judge that defendants were not negligent. The act was unforeseeable in light of George's good record for the preceding ten years. Moreover, his precommitment episode of fire-setting was insufficient to establish he had pryomaniacal tendencies. The expert testimony indicated that the decision to place George on the farm was consistent with good psychological practice. Although Berneice Knight did inform Knaggs of her suspicions on the afternoon of the final fire, he was not then possessed of sufficient information to warrant removing George from the farm and did not have a reasonable amount of time to check George's record before the fire. Had she earlier informed

Knaggs of her suspicions, our result might have been different.

Finally, plaintiffs contend that the trial judge erred in holding that they failed to prove defendants intentionally or innocently misrepresented the episode of setting fires in George's past which precipitated his commitment.

The elements constituting actionable fraud or misrepresentation were recapitulated in *Hi-Way Motor Co v International Harvester Co,* 398 Mich 330, 336; 247 NW2d 813 (1976), citing *Candler v Heigho,* 208 Mich 115, 121; 175 NW 141 (1919), to wit:

"The general rule is that to constitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with a reasonable degree of certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery."

In the case at bar, we do not believe that Knaggs' failure to inform plaintiffs of the precommitment fire-setting incident in which George was allegedly involved constituted a material misrepresentation. The evidence shows that plaintiffs never specifically inquired about George's propensity toward arson but merely inquired generally about his safety on the farm and attitude toward animals. Given his knowledge at the time, including George's record at Coldwater, Knaggs truthfully replied that George was a safe individual for placement. To reiterate, we do not believe defendants

were under a duty to disclose the unsubstantiated precommitment incident of fire-setting. Although Knaggs was informed of Berneice Knight's suspicions about George on the afternoon of January 12, 1970, the record shows that he did not have George's file at hand or have time to check his file before the fire occurred. Therefore, despite the tragic loss herein, we agree that defendants should not be held accountable.

Affirmed. Costs to defendants.